# The Naugatuck Railroad Company *vs.* The Waterbury Button Company.

The Act of 1852, authorizing the granting of nonsuits in civil actions, where the plaintiff, who has produced his evidence and rested his cause, shall have failed to make out a *prima facie* case, is not repugnant to the constitution of this state, as impairing the right of trial by jury.

It being provided, in the charter, that a railroad corporation might "make any lawful contract with any other railroad corporation in relation to the business of such road;" it was held, that the object of this permission was to enable such road to contract for the common use of so much of another road already constructed as lay within the limits of the road so chartered.

In an action on the case, founded on the legal liability of a railroad corporation as common carriers, to recover for the loss of goods directed to N. Y. a place situated beyond the terminus of such road, the declaration alleged that the defendants were common carriers to N. Y. On the trial, it was admitted that the goods had been transported safely over the defendants' road, and deposited on board a steamboat for N. Y. where they were burnt. The plaintiff gave in evidence the defendants' charter, containing the permission aforesaid, also an advertisement, published in a newspaper, stating that freight would be billed by the defendants to N. Y., and evidence that the plaintiffs had been in the practice of sending freight to N. Y. over the defendants' road from the time it went into operation, and that the defendants had made no demands of the plaintiffs, for the freight of said goods, and then rested their cause. The defendants thereupon moved for a nonsuit which was granted. Held, that such nonsuit ought not to be set aside. [One judge dissenting.]

THIS was an action on the case, founded on the liability of the defendants as common carriers.

The declaration alleged that " the defendants were the owners of a certain railroad commonly known as the Naugatuck railroad, constructed from the town of Winchester in Litchfield county, through the towns of Torrington and Plymouth, in the county last aforesaid, and the towns of Waterbury, Naugatuck, Seymour and Derby to Milford, in the county of New Haven, and were also the owners of certain cars and carriages and locomotive steam-engines to draw the same, used thereon, and which said cars, carriages and locomotive steam-engines to draw the same as aforesaid, were then and ever since have been used and employed, by the

The Naugatuck Railroad Company *v.* The Waterbury Button Company.

defendants, in carrying and transporting goods, wares and merchandize as common carriers for hire, freight and reward, paid to the defendants therefor, along, over and upon their said railroad from the town of Waterbury aforesaid, through the towns of Naugatuck, Seymour and Derby, to the town of Milford aforesaid, and thence upon other railways and steamboats and vessels to the city of New York, in the state of New York, and to the city of Boston in the state of Massachusetts, and that on the 20th day of July, 1852, at the town of Waterbury aforesaid, the plaintiffs caused to be offered and delivered to the defendants, to wit, as common carriers, and the defendants then and there received as such carriers, two certain boxes containing buttons of the plaintiffs of great value, to wit, the value of three hundred dollars, to be safely and securely carried and conveyed for the plaintiff by the defendants from Waterbury aforesaid, upon their said railroad and other railways and steamboats and vessels, and to be carried by the defendants to be left at a certain other place, to wit, at the city of Boston in the state of Massachusetts; also three certain other boxes containing buttons of the plaintiffs, of the value of five hundred dollars, to be safely and securely carried and conveyed for the plaintiffs by the defendants from Waterbury aforesaid, upon their said railroad and other railways and steamboats and vessels, and to be caused by the defendants to be left at the city of New York in the state of New York, for certain hire and reward, to be therefor paid by the plaintiffs to the defendants. And although, by reason thereof, the defendants ought carefully and safely to have conveyed, or caused to be conveyed, said two boxes of buttons upon their said railroad and other railways, steamboats and vessels to the city of Boston aforesaid, and said three boxes of buttons upon their said railroad and other railways, steamboats and vessels to the city of New York aforesaid," &c.

The declaration embraced other counts, but the variations from the foregoing were not material.

The defendants pleaded the general issue, and the cause was tried at the term of the superior court, holden in Dec., 1855.

It was admitted on the trial, that the plaintiffs were a corporation, duly organized as described in the declaration, and that on the 21st day of July, 1852, the plaintiffs delivered to the defendants at their station, in the town of Waterbury, for transportation, five boxes, containing buttons of the value and marked and directed as follows, viz :

|       | marked.                                  |             | value.  |
|-------|------------------------------------------|-------------|---------|
| 1 Box,| " Geo. H. Chapman, Jr. & Co., Boston,"   |             | $98.32  |
| 1     | " D. J. Foster & Co.,                    | Boston,"    | 103.60  |
| 2     | " Burnham, Plumb & Co.,                  | N. York,"   | 248.51  |
| 1     | " Peet & Wakeman,                        | N. York,"   | 162.15  |

and in addition to the aforesaid marks, each box was marked " Care of Saxton & Webb, New York."

Said boxes were delivered by the plaintiffs and received by the defendants, without anything being said, or any direction given except as indicated by the marks and directions upon them. The defendants on the same day placed said boxes in their rail cars, and transported the same over their own railroad, and the New York and New Haven railroad, to the city of Bridgeport, where they took the boxes from the cars and placed them on board a steamboat, called the "Alice," and on the night of the same day, said steamboat, with said boxes, was destroyed by fire, in the harbor of Bridgeport.

It was also admitted that Philo Hurd was the superintendent of the Naugatuck railroad company, during the year 1852.

The plaintiffs offered in evidence the charter of the Naugatuck railroad company, granted in May 1845, which contained the following provision. " And for the purpose of constructing said railroad on way, the said company is hereby authorized to lay out their road not exceeding six rods wide, through the whole length; and for the purposes

of cuttings and embankments, and for the purpose of necessary turnouts, and for obtaining stone and gravel, may take as much more land as may be necessary for the proper construction and security of said road; with permission also to make any lawful contract with any other railroad corporation, in relation to the business of said company."

The plaintiffs also offered, in evidence, the following advertisement, published by the Waterbury American, a weekly newspaper, printed and published in the town of Waterbury, in New Haven county, commencing in April, 1852, and regularly continued until after the 21st day of July, 1852.

" *Naugatuck Railroad, Summer Arrangement, Commencing April 26, 1852. Five Trains to and from Waterbury, daily.*

*Trains out of Bridgeport.*—First passenger train will leave Bridgeport for Winsted, at 10.35 A. M., or on arrival of the 8 A. M. Express train from New York, connecting at junction with the 10.20 A. M. train from New Haven.

Second passenger train will leave Bridgeport for Winsted at 6.05 P. M., or on the arrival of the 3.30 P. M. Express train from New York, connecting at the junction with the 5.50 P. M. train from New Haven.

First freight train, with passenger car attached, will leave Bridgeport for Winsted at 5.20 A. M.

Second freight train will leave Bridgeport for Waterbury at 8 A. M. connecting at Stratford with 7.00 A. M. train from New Haven.

Third freight train will leave Bridgeport for Waterbury, at 4.25 P. M.

*Trains into Bridgeport.*—First passenger train will leave Waterbury at 6.00 A. M., connecting at the junction with a train to New Haven, and at Bridgeport with the 7.38 A. M. train to New York.

Second passenger train will leave Winsted at 7.00 A. M., connecting at the junction with a train to New Haven, and at Bridgeport with the 10.15 A. M. train to New York.

Third passenger train, will leave Winsted at 2 P. M., connecting at the junction with the train to New Haven, and at Bridgeport with the 5.02 P. M. train to New York.

First freight train will leave Waterbury at 1 P. M.

Second freight train will leave Winsted at 12.50 P. M.

\*\* A passenger car will be attached to each freight train.

A line of stages from Woodbury, Southbury, Southford and Oxford, will connect at Seymour, (Humphreysville) with the 9 A. M. train down, and on Mondays, Wednesdays and Fridays with the 4 P. M. train. Returning, will leave every day on the arrival of the 6.05 P. M. train from Bridgeport, and on Tuesdays, Thursdays and Saturdays the 10.35 A. M. train from Bridgeport.

McNeil's stage from Watertown, will connect at Waterbury every day with the 8.30 A. M. train down, returning on the arrival of the 10.35 A. M. train from Bridgeport, and on Tuesdays, Thursdays and Saturdays with the 3.35 P. M. train down, returning on the arrival of the 5.05 P. M. train from Bridgeport.

A stage from Terryville will connect at Plymouth with the 8 A. M. train down, returning on the arrival of the 10.35 A. M. train from Bridgeport.

Fenn's stage from Litchfield will connect at Litchfield station with the passenger trains each way.

☞ Freight will be way-billed as usual, from each station, for New York, New Haven and Bridgeport. The facilities for transporting freight having been greatly increased, shippers may rest assured that their goods will be taken through to their destination with dispatch.

PHILO HURD, *Sup't.*"

Bridgeport, April 20, 1852.

It was also proved and admitted by the defendants that handbills, containing a copy of said advertisements, were published and distributed by the defendants, along the line

of their road, at the said time said advertisement was published in the said newspaper.

The plaintiffs also introduced as a witness, Henry H. Hayden, who testified as follows :

" That he was the President and acting manager of the business, and affairs, of the Waterbury Button Company, on the 21st day of July, 1852, and had been so for two or three years before. The plaintiffs had been in the habit of sending their goods to New York by the Naugatuck railroad ever since the road went into operation. The Naugatuck railroad intersects the New York and New Haven Road at the junction in the town of Milford, and from thence runs on the New York and New Haven railroad tracks to the city of Bridgeport, and the New York and New Haven railroad extends from New Haven through the city of Bridgeport, to the city of New York. The freight on all the plaintiffs' goods, sent to New York, was paid by the plaintiffs' agents, in New York, on their receipt there, and by said agents charged over to the plaintiffs, and paid by the plaintiffs to said agents in their settlements every six months, and the plaintiffs, by the arrangement and understanding with their agents, were to deliver their goods in New York. The witness had no knowledge that the plaintiffs' goods, directed to New York, ever went by steamboat, but supposed they always went by railroad over the defendants' road and the New York and New Haven railroads. The defendants were engaged in the business of transporting freight and goods by their said railroad, and have received freight from the plaintiffs, and other parties in Waterbury, for transportation, directed to New York in the same manner that said boxes were received, for a long time prior to said loss. The defendants never gave to the plaintiffs any notice of the way in which their goods were sent to New York, except such notice as was given by said advertisement, which it was the impression of the witness he had read. The plaintiffs entrusted these boxes to the defendants, supposing them to be

responsible, and that they would fulfill what they undertook. Saxton & Webb were forwarders of goods across the city of New York, and goods were sent to them from all points. He did not know any thing about the way in which the defendants made out their way bills, and had no recollection of ever seeing any steamboat freight bills. The defendants had never made any demand on the plaintiffs for the freight of said five boxes, shipped on the 21st July, 1852, and lost.

The plaintiffs also introduced a witness, Charles M. Mitchell, who testified as follows:

" That he was the secretary of the Waterbury Button Company on the 21st day of July, 1852, and had been such prior to that time, that he had no knowledge that their goods went to New York, except by railroad, and did not know there was any route to New York by steamboat. He did not know, but supposed that the defendants' railroad terminated at Stratford or Bridgeport, and was not aware that any steamboat ran from Bridgeport. The defendants had never made any demand of the plaintiffs for the freight of said boxes, lost. He could not describe a way-bill, but supposed it something similar to a bill of lading; that it was a bill, which goes with the goods, showing where they come from, and are to go."

The plaintiffs also offered, in evidence, a letter written by N. H. Perry, the defendants' agent at Waterbury, on the 22d July, 1852, directed to and received by the plaintiffs, which was as follows:

" Gent.—The goods shipped by you on the 21st inst., were destroyed by fire this morning on board steamer " Alice."

Respectfully,

July 22d.                              N. H. Perry."

And thereupon the plaintiffs rested their cause.

And the defendants thereupon, moved for judgment as in case of nonsuit, for the reason that the plaintiffs had failed

to make out a *prima facie* case, which motion was granted by the court.

The plaintiffs thereupon filed a motion to set aside said nonsuit, which the court refused to grant. The plaintiffs then, by motion in error, brought the case before this court for revision.

*N. J. & T. S. Buell.* in support of the motion.

I. The court erred in granting the nonsuit, and refusing to set aside the same, because, the issue having been closed to the jury, and the plaintiff having introduced his evidence to the jury under that issue, it was not competent for the court to grant a nonsuit, and thereby deprive the plaintiff of the right of trial by jury. 1. The act of 1852, authorizing the court to grant nonsuits, is unconstitutional and void, because it conflicts with the provision of Art. 1, § 21, of the constitution, which declares that " the right of trial by jury shall remain inviolate." *Beers* v. *Beers*, 4 Conn. R., 535. 2. The granting of nonsuits by the court, in trials to the jury, was unknown in Connecticut at the time of the adoption of the constitution, and not authorized by the common law of the state, or the provisions of any statute, or any practice, or custom. 3. The plaintiffs had a right to have the jury pass upon the evidence submitted to them, under such instructions as the court might deem proper to submit to them, upon the law and the evidence; and in case their verdict was not approved by the court, to return them to a second and third consideration, and no more. 1 Conn. R., 472.

II. The plaintiffs, by their evidence, established and made out a *prima facie* case, and it should have been submitted to the jury. 1. The defendants, by their charter, had power to make contracts with the New York and New Haven railroad company, (in relation to their business, one branch of which was the transportation of freight,) for the transportation of freight to New York, and to form a joint arrangement with them to that effect. Private Acts, 1845, p. 88. 2. The ad-

vertisement of the defendants was *prima facie* evidence, that as to three points, New York, New Haven and Bridgeport, they had made arrangements with the New York and New Haven road to transport freight to those points ; and the language is so plain and explicit, as to import an express undertaking and assurance, that all goods for those points only, delivered to them for transportation, would be forwarded to their destination by them. 3. In connection with the chartered powers of the defendants, and their intersection with, and use of a part of the New York and New Haven railroad, their advertisements and handbills, the reception of the goods by the defendants, directed to one of the points named in their notice, the freight to be paid at the point of destination, nothing said or intimated by the defendants contrary to the stipulations of their notice, and no knowledge on the part of the plaintiffs to the contrary, was *prima facie* evidence of an undertaking to carry to New York. 8 M. & W. R., 421. 3 E. L. & E. R., 497. 18 E. L. & E. R., 553. Ang. on Car. § 95. 1 Pars. on Cont., 687. 4. The omission of the defendants to ask for, or claim pay, for the transportations of the goods from Waterbury to Bridgeport, was a fact furnishing strong evidence, and from which the jury might have fairly inferred that the defendants' contract was to carry to New York; and that the defendants knew, and had acted upon the idea, that they were not entitled to compensation, unless they fulfilled their contract. 5. If the defendants had not the power, by their charter, to contract to carry to New York, yet if they have held themselves out to the world as having that authority, and thereby induced others to act upon that belief, they are estopped from averring the contrary. 1 Pars. on Con., 120. *Noyes* v. *Rutland* and *Burlington R. R. Co.*, 27 Verm., 110.

*Dutton* and *Munson*, and *Blackman*, against the motion.

There being no promise or undertaking of the defendants alleged, or proved, there was no evidence showing a *prima*

*facie* liability of the defendants, as common carriers, from Waterbury to New York. If the marks on the goods tended to show this, it would never be safe for a common carrier to receive an article, labelled beyond the line of his business.

1. It is to be observed that the defendants were not paid for transportation for the entire distance the goods were to be transported. Being common carriers, the defendants were bound to carry them towards their destination, so far, as they had represented themselves as common carriers. It is admitted that the goods in question were properly transported to the southern terminus of the defendants' road, and safely deposited on board the steamer for New York, on which they were burned. Where a carrier receives goods marked for a particular destination, beyond the route for which he professes to carry, and beyond the terminus of his road, he is bound only, in the absence of any special agreement, to transmit and deliver such goods to, and at the terminus of his road, and is not liable for losses beyond his own line. *Jennison* v. *Camden & Amboy R. R. & T. Co.*, Law Reg., vol. 4, p. 224. *Vansantvoord* v. *St. John*, 6 Hill, N. Y., 157. *Farm. & Mech. Bank* v. *Champ. Tr. Co.*, 18 Verm., 140. 23 Verm., 209. *Nutting* v. *Conn. R. R. Co.*, 1 Gray, 502. *Hood* v. *New York & New Haven R. R. Co.*, 22 Conn. R., 1, and 502. No special contract is alleged, and no evidence was offered to prove such contract. The claim of the plaintiffs is based only upon delivery of the goods. It is obvious from the marks upon the boxes, that the plaintiffs did not intend to make the defendants their carriers from Waterbury to Boston, for Saxton & Webb were to take charge of them in New York. There is nothing from which to draw an inference, except the mark of the place of destination.

2. The advertisement of the defendants does not change the nature of the contract. In order to give this its true construction, it must all be considered.

3. The defendants could not make the contract, alleged in

the declaration. *Hood* v. *N. Y. & N. H. R. R. Co.*, 22 Conn. R., 502. But it is unnecessary to call on the court to decide on this claim. The main question is, does the evidence reported warrant the conclusion that such a contract was made ?

The court would set aside a verdict for the plaintiff, as a verdict against the weight of evidence. *The Thames Steamboat Co.* v. *The Housatonic Railroad Co.*, 24 Conn. R., 40.

ELLSWORTH, J. There is no question, in our view of the constitution, that the legislature could properly authorize a court to nonsuit the plaintiff upon the defendants' motion. The clause in the constitution, which provides that the trial by jury shall remain inviolate, presents no obstacle to this legislation. Its object is simply to preserve a jury trial in questions of fact, and it does not relate to questions of law with the court. The jury have nothing to do with the relevancy and materiality of evidence, or with inferences of law from facts fully established or not denied. If all the facts, claimed to be proved by the evidence of the plaintiff, cannot, if true, make a *prima facie* case for him, it would be worse than idle to proceed further with the trial ; since no verdict could be rendered in his favor, which could be retained. It is no uncommon thing to raise the question of the sufficiency of evidence upon demurrer to evidence, wherever the court will give its consent, as the readiest way to end the trial, and this is not a violation of the constitution. The trial by jury would indeed present a singular spectacle, if because an issue in fact is joined to the jury, whatever evidence is offered by the plaintiff, to prove his case, must be received and considered, lest the province of the jury should be invaded, or if the fact, claimed to be proved, is admitted, its materiality or sufficiency may not be decided by the court. If the court come to a wrong decision, there may be an appeal to the supreme court to correct the error, and beyond this, there is no relief known to the law. The statute, as well as the com-

mon law, requires the plaintiff to introduce evidence which fairly tends to establish a *prima facie* case, in his favor, and if he has not done this, as we think he had not, in this instance, he sustains no injury, by the order for a nonsuit. *Harris* v. *Thompson*, 24 E. L. & Eq., 380. Besides, this mode of trying a question of law, had always been practised at the common law, and was familiarly known to the men who framed our constitution; and it is not to be believed, that they meant, by this clause in the constitution, to restrict the courts and the legislature itself, in relation to this ancient practice.

The more important question in the case is, did the plaintiffs make a case, which should have been submitted to the jury? A majority of the court think they did not. This declaration is in the form of case for default of duty as common carriers from Winchester, or Waterbury, to New York or Boston, or both, varying somewhat in the different counts in the declaration, and is doubtless the only form for obtaining relief, which could have been adopted, with any hope of success. The termini of the defendant's duties as set forth, are quite important to the issue, not only as descriptive of the evidence to be adduced on the trial, but as to the place and circumstances, where the loss of the property happened, and if the defendants are not common carriers to Boston or New York, as described, they are not liable for any default on this declaration. 2 Greenl. Ev., § 209. 1 Bing., 162. 2 B. & P., 54. 12 East., 89. A common carrier is one who holds himself out to the public, to carry persons or freight for hire. If this is so, we of necessity look to see from the evidence, or facts detailed in the record, what there is which conduces to prove that the defendants held themselves out to the public as common carriers to New York, or Boston, or to any place beyond their own road. If the mark, on boxes of freight, "Boston" or "New York", proves this fact, then if they had been marked Philadelphia, New Orleans, or London, this would have proved they were com-

mon carriers to those places. The defendants, too, have a known and public charter and character as carriers over their own road, from one terminus to the other, and it is quite unreasonable, and absurd, to say that by using their own road in the usual and appropriate manner of using it, they hold themselves out to the world as common carriers to any and every point and place, to which their freight happens to be marked, however that place is to be reached, by railroads, sail boats, freight wagons, pack horses or footmen. In the ordinary course of business, freight, prepared for transportation, must be so marked and forwarded, and every sort of common carrier takes it in his public capacity, in that exact condition and must so take it if at all. The defendants, we conceive, were obliged to receive the boxes in question just as they were marked, and to carry them to the southern terminus of their road, and thence forward them according to the course of business; and their being marked to go to a place beyond Bridgeport has nothing to do with the defendants' character or duty, except as just expressed. If persons who send freight, expect or desire more than this from common carriers, let them exact an agreement from the carrier, to whom they first deliver the property, that he will be responsible, as the common carrier throughout the entire transit. We believe that business men look at this matter in the light we have expressed, and that it is not supposed that a mere reception of goods implies that the receiver of them, whose known and customary business is to carry to a given place, promises to carry them beyond it. We forbear to say more, because in the late case of Elmore, against these defendants, 23 Conn. R., 474, we went over this whole ground and came to the conclusion that the defendants were not liable, as already expressed. The same doctrine as held in *Nutting* v. *Conn. R. R.*, 1 Gray., 502. *Vansantvoord* v. *St. John*, 6 Hill, 157. *F. & M. Bank* v. *Champ. Tr. Co.*, 18 Verm., 140, 23 Verm., 209. *Hood* v. *N. Y. & N. H. R. R. Co.*, 22 Conn. R., 1.

We need hardly remark, that we see no evidence of a

The Naugatuck Railroad Company *v.* The Waterbury Button Company.

usage or practice, by the defendants, or of any promise, or undertaking by them, (were that important in this suit,) to carry persons, or freight, beyond the line of their own road; nor is it pretended that they have ever made any arrangement with any other railroads to carry their freight for them, to New York or Boston, or elsewhere. These several companies run over their own road, and that is all that is pretended to exist in fact.

The other piece of evidence, supposed to make in favor of the plaintiff, is an advertisement in the Waterbury American and other papers, and set up in certain public places. We commented upon this testimony at length in the case of Elmore against the present defendants, when we said we attached but little or no importance to its import, and we still entertain the same views; that it furnishes no proof, that the defendants were carriers to New York, or that they undertook by special promise, to become such, even if a special promise could do it. The present argument has served to strengthen those convictions. It is even now said on the part of the defendants, that this advertisement, instead of making a case for the plaintiffs, makes against them. It begins, "Naugatuck Railroad,—summer arrangement,—five trains to and from Waterbury;" it then goes on to say, what passenger trains and what freight trains leave Bridgeport to go north to Winsted, and what trains go south from Winsted to Bridgeport. Not a word is said about their trains running beyond Bridgeport. Nor do I believe that the plaintiffs, or any one else, from a mere perusal of this notice or advertisement, inferred anything more. What it says in allusion to the N. Y. & N. H. road, is that the defendants' trains will, at Bridgeport and Milford, meet the trains of that company. In the former case, we likewise commented upon that part of the advertisement, which speaks of the freight-bill; we will not now repeat what we then said, but refer to that as our present opinion, viz. that no argument can be derived from it, in behalf of the plaintiff.

Another question of general importance is raised by the defendants' counsel, which is not altogether unworthy of notice ; we mean the power of the defendants, under their charter, to become common carriers to New York, Boston, &c. We do not mean definitively to decide this question, but a majority of the court are not satisfied that the Naugatuck R. R. Co., can become common carriers beyond their own road to New York, or Boston, or Philadelphia, or New Orleans, or London. Such extensive authority would not seem to be contained within the express powers or objects of the charter, or to be fairly implied as within the exercise and enjoyment of any powers which are given. If this be so, where then shall we find the power ? If indeed there be no limits in the charter, then may the defendants become common carriers, universally, and without limit, certainly of that freight which has had any part of its transit over the defendant's road. But can this be law ? The only clause, which has been spoken of as authorizing it to be done, is a clause, directly following the provision which enables the defendants to obtain their right of way, and is in these words, " with permission also to make any lawful contract with any other railroad corporation in relation to the business of said company." We do not understand this as authorizing the defendants to extend their road to Boston or New York or elsewhere, either by buying, leasing, or using other roads under their respective charters, or under the defendants' charter ; certainly not, in any such sense as being themselves the common carriers on those roads, possessing, and controlling the freight as their own. We think permission was given to enable the defendants to contract with the N. Y. & N. H. road for the common use of that portion of their road which lies within the charter bounds of the Naugatuck road, and to enter into an arrangement with the N. Y. & N. H. road, to run the same car entirely through, but each company, running for itself over its own road, and at its own risk and expense, as much so as if no arrangement had been made.

It is no uncommon thing for the same cars to pass continuously over the entire road, from New York, to Boston, but the several companies own, and use, each one its own road as absolutely as if no such arrangement had been made, and it is idle to pretend that a person, who takes his seat in one of these cars, sustains a different relation to the company, over whose road he passes, from what he would, had he changed his car from road to road. *Thompson* v. *Worcester & Boston Railroad,* 9 Cush., 30. All railroad companies, like individual carriers, may at the end of their own route forward the freight which has been entrusted to them, but this power does not grow out of any specific provision in the charter; it is a mere incident depending on the necessity of the case, or the general course of business.

It has been claimed, that if the defendants are common carriers to Bridgeport, and no further, they are even then liable, in this instance, since it does not appear that the Alice, which was burnt, with the plaintiffs' goods on board, in the harbor, was a suitable vessel to receive the goods, to be transported to New York. It is obvious that the motion was not drawn upon the idea of any such question, for none such was made, or alluded to below, as we understand from the judge who presided, nor, as we have a right to presume, from the fact that it was not made, will it be of any benefit to the plaintiff, if we grant a new trial; hence, we do not feel bound to grant a new trial on that account, and besides, if the defendants are not common carriers as described in the declaration, they cannot recover, in this suit.

In this opinion, STORRS, J. concurred.

HINMAN, J. said he felt bound to yield to the opinion of the court in the case of *Hood* v. *The New York & New Haven Railroad Company,* 22 Conn. R., 502, and *Elmore* v. *The Naugatuck Railroad Company,* 23 Conn. R., 457, and, on the authority of those cases, did not dissent from the foregoing opinion, although, but for those cases, he should have felt bound so to dissent.

A new trial not granted.